W. L. REA, d/b/a W. L. Rea Construction Company, Appellant,

v.

SIMMONS & SIMMONS CONSTRUCTION CO., Inc., Appellee.

No. 12775.

Court of Civil Appeals of Texas.

San Antonio.

Feb. 2, 1955.

Rehearing Denied March 3, 1955.

748

North, Blackmon & White, Corpus Christi, for appellant.

Powell, Wirtz, Rauhut & McGinnis, Robert C. Duke, William A. Brown, Austin, for appellee.

W. O. MURRAY, Chief Justice.

This suit was instituted by Simmons & Simmons Construction Company, Inc., against W. L. Rea, d/b/a W. L. Rea Construction Company, seeking to recover damages for the breach of an unsigned written contract, whereby plaintiff agreed to do outside electrical work at Foster Air Force Base, Victoria, Texas. Plaintiff was the subcontractor, and defendant the general contractor.

The trial was to a jury, and judgment in the sum of $6,870.16 in favor of plaintiff was based upon the answers of the jury to the issues submitted. W. L. Rea, doing business as W. L. Rea Construction Company, has prosecuted this appeal.

The written contract sued upon was signed by appellee but not signed by appellant, and the question here presented is whether the contract, under all the circumstances, was binding upon appellant so as to hold him liable for damages for a breach thereof.

The jury found in answer to Special Issue No. 1, that both Jack Jones, general manager of appellee, and W. C. Bonvillain, general manager of appellant, intended that the written contract would become binding on both parties on July 22, 1952, whether or not actually signed by both parties.

On July 22, 1952, these two agents met for the purpose of negotiating the contract herein sued upon. After much discussion, Bonvillain had his secretary type up the contract here involved and gave several copies of it to Jones. At this point the statement of facts shows the following:

"Q. What did Mr. Bonvillain do with those written terms after they had been reduced to writing? A. He gave them to me.

"Q. What did he tell you when he gave them to you? A. He told me to take them, they were in several copies, take them with me, and obtain a bond, have the contract signed, the documents signed, on behalf of our organization, place with it the bonds so obtained, and return it to the W. L. Rea Construction Company for signature."

This testimony, given by the general manager of appellee, when considered

with other evidence, conclusively establishes that it was the intention of the parties that the contract should be in writing and signed by both parties thereto. The contract is set out in full in the statement of facts. It is a formal and complete contract and occupies six pages of the statement of facts.

The preamble to the contract reads as follows:

"This agreement made the twenty second day of July in the year Nineteen Hundred and fifty two, by and between Simmons & Simmons Construction Company, Inc., hereinafter called the Contractor, and W. L. Rea, an individual doing business as W. L. Rea Construction Company, hereinafter called the Owner, witnesseth, that the Contractor and the Owner for the considerations hereinafter named agree as follows:"

Following this preamble is Article 1, relating to "Scope of the Work," Article 2 relates to the "time of Completion," Article 3 relates to "The Contract Sum," Article 4 relates to "Progress Payments," Article 5 relates to "Acceptance and final Payment," Article 6 relates to "The Contract Documents," and reads as follows:

"The General Conditions of the Contract, the Specifications and the Drawings, together with this Agreement, form the Contract, and they are as fully a part of the Contract as if hereto attached or herein repeated. The following is an enumeration of the Specifications and Drawings:

"All Drawings applicable to the Electrical Distribution System as listed in Contract No. DA–41–243–Eng–1545, Specifications and Addenda one through five.

"In Witness Whereof the parties hereto have executed this Agreement, the day and year first above written.

"W. L. Rea Construction Company

By _____
                    W. L. Rea, Owner

"Acknowledgement:

"Subscribed to and sworn before me this —— day ———, 1952.

_____

"Simmons & Simmons Construction Co. Inc.

By        Jack D. Jones
_____
          Jack D. Jones, Sec.-Treas.

"Acknowledgement:

"Subscribed to and sworn before me this 26 day of July, 1952.

"Frances McWilliams
Notary Public

"(Seal: Notary Public
          County of Travis, Texas)"

This contract shows on its face that it was intended that it should be executed by both parties signing it in the spaces provided for such signatures.

It is undisputed that appellee was to furnish a performance bond in the sum of $27,000.

Jack Jones took these several copies of the written contract with him to Austin. Four days thereafter, on July 26, 1952, he signed the instruments and swore to them before a Notary Public. On the same date he procured a performance bond in the proper amount.

In reply to a question as to what he did with the copies of the contract and the bond, Jack Jones answered as follows:

"I placed it with the required number of copies. I believe there were two or three copies of the document Mr. Bonvillain had given me, signed that document on behalf of Simmons & Simmons Construction Company, placed them in an envelope and mailed them to W. L. Rea Construction Company."

Three days later Jones received a letter from appellant stating, among other things, that it would be impossible for appellant to enter into the contract.

This evidence, either given by Jack Jones, appellee's general manager, or supplied by documents introduced by appellee, conclusively proves that the parties intended to enter into a written contract to be signed by each of them. Appellee signed the contract but it was never signed by appellant.

In Vol. 1, Williston on Contracts, § 28a, p. 67, this statement is made: "It is the undoubted rule that where the contract contemplates the execution of it by signing either party has the right to insist upon the condition, and mere acts of performance upon the part of one who has not signed will not validate the contract."

With reference to part performance by one party, the same section has this to say: "* * * Acts of performance by one party, unless they have been received as such by the other, cannot be evidence that the latter either had previously made an agreement on definite terms, or that he had subsequently assented to a contract."

This seems to fit the case at bar perfectly. Here undoubtedly the parties intended to make a written contract to be signed by both parties, or else why did they draw up the contract with a number of duplicate copies and why did Jones take copies of the instrument with him to Austin and sign them before a notary public, and why was space provided for Rea to do the same thing, and why did Bonvillain tell Jones to sign the contract, secure a performance bond and return them to appellant for signing? The formal provisions of the contract indicate that it was to be fully executed by both parties signing.

Jones testified that he spent some money getting ready to perform his part of the contract, but he does not show that Rea ever knew anything about this or accepted any benefits as a result thereof. The record affirmatively shows that within three days after Jones mailed the contract and bond to appellant, appellant wrote him a letter telling him it would be impossible to enter into the contract.

There is evidence in the record tending to show that an oral contract might have been entered into but the suit here is upon the written contract signed by appellee but not signed by appellant.

The question here presented is not whether there was a prior oral contract entered into before the written contract was drafted. It is clear that this suit is based upon a written contract signed only by appellee. The question of a prior oral contract is not in the case. The real question is, did this written contract become binding on July 22, 1952, the day it was drafted, as found by the jury, or was it to become effective when signed by the parties? If the parties intended that the contract should not become binding until it was signed by the parties, then the signatures of both parties were required to give effect to the written contract. The question is not whether the parties intended to make a written contract or an oral contract, because both parties contend that they intended to make a written contract; the question is, did they intend to make a signed or unsigned contract? It is unquestionably true that parties can make a written contract and agree that it will be

binding upon them without the signature of either being subscribed to the writing, or even that it shall be binding when signed by one of the parties.

What did the parties intend with reference to the written contract here involved? Did they intend that it should be signed by both parties before it became effective, or did they intend otherwise? The closing paragraph indicates that their signatures are to be placed thereto. Spaces were left for such signatures. Jones testified in effect that when he received the draft of the contract he was to do three things: he was to sign the contract, he was to procure a performance bond, and then mail both the contract and the bond back to appellant, so that appellant could sign the contract. These facts, which are undisputed, show that both of the parties were contemplating a signed contract. Appellee did sign the contract, he did secure a bond and he did return them to appellant for his signature. Appellant did nothing to show that he was accepting the contract as a binding obligation.

■ Three days after appellee mailed the contract and bond to appellant, he wrote appellee that it would be impossible for him to enter into the contract. There is nothing in the record to indicate that the parties intended for the written contract to become effective without the signatures of the parties. The appellee was alleging a legally binding written contract, and the burden of proof was upon him to establish such a contract by the evidence. He has failed to discharge this burden. The contract provides, "In witness whereof the parties hereto have executed this agreement," this calls for the signatures of the parties. If the contract was not to be signed, why did appellee sign it, and why did he return it to appellant for his signature, as he had been directed to do?

It is not a question here of whether the contract was to be reduced to writing, it was reduced to writing. It is not a question of whether appellee was to sign the contract, he did sign it, the only question is, was it intended that appellant should also sign the contract? It would be unreasonable to presume that after the contract was reduced to writing, and after it had been signed by appellee, it would be regarded as fully executed without the signature of appellant. All of the evidence points to the fact that the contract was to be executed by the signatures of the parties, and none of the evidence points to the contrary.

■ When a contract containing mutual obligations has been reduced to writing in the form of a complete contract and signed by one of the parties it is strong proof, in the absence of any evidence to the contrary, that the other party was also to sign the contract before it was to become binding. Chavez v. Goodman, Tex.Civ. App., 152 S.W.2d 826; Magnolia Petroleum Co. v. McMillan, Tex.Civ.App., 168 S.W.2d 881; 10 Tex.Jur. 65, Notes, § 152; Houston Oil Co. v. Singleton, Tex.Civ. App., 44 S.W.2d 479; Parmer County v. Smith, Tex.Civ.App., 47 S.W.2d 883; Vol. 1, Williston on Contracts, p. 59, § 28.28a.

The only exception to this rule is where the party which has not signed, has otherwise assented to the contract, or has accepted benefits under the contract. Martin v. Roberts, 57 Tex. 564; Campbell v. McFadin, 71 Tex. 28, 9 S.W. 138; 10 Tex. Jur., p. 264, § 152.

The only evidence, if any, that the parties intended the written contract to become binding and enforcible on July 22, 1952, before it was signed by either party, is: just after Jones had testified that Bonvillain had given him the unsigned copies of the contract, with instructions to secure a performance bond, sign the copies of the contract and return them to appellant for signature, Jones was asked the following questions and gave the following answers:

"Q. All right, sir. When was this? A. Approximately the 22nd day of July, 1952.

"Q. Did Mr. Bonvillain—state whether or not Mr. Bonvillain gave you any in-

structions with regard to starting the work? A. He put in the contract the words we should start work on the first day of August, provided material was on hand at that time. I believe that was the understanding. It is not in the document itself. It goes without saying we couldn't start work until the material was on hand.

"Q. Did he say anything to you about starting to work? A. He said to be available to start work when the materials were had."

█ This evidence does not indicate in any way that Bonvillain was waiving the procuring of a performance bond and the signing of the contract.

Under the evidence given by appellee's general manager and the documents introduced in evidence by appellee, reasonable minds cannot differ as to the intention of the parties to execute a written contract to be signed by both parties.

█ The jury's answer to Special Issue No. 1, to the effect that it was the intention of the parties that the written contract was to become effective on July 22, 1952, being unsupported by any evidence of probative force, should have been disregarded by the trial court, and judgment should have been rendered that appellee take nothing.

Reversed and Rendered.